## UNITED STATES DISTRICT COURT
## WESTERN DIVISION OF MICHIGAN
## SOUTHERN DIVISION

ELAINE ANDERSON, as Personal Representative
of the ESTATE OF DAVID CORTEZ JUNIOR WRIGHT,
deceased,

                                Plaintiff,

v.

COUNTY OF BERRIEN; SHERIFF LEONARD P. BAILEY;
CAPTAIN CELENA HERBERT; SERGEANT JACOB WILL;
DEPUTY CHRISTINE CIPRIANO; DEPUTY MARK BOELCKE;
DEPTUY BRITTANY ZABEL; DEPUTY KENDRA WARMAN;
DEPUTY NICHOLAS JEWELL; DEPUTY EDWARD KEHOE;
DEPUTY RYAN SCIENSKI; WELLPATH, LLC a Foreign
Limited Liability Company; REX CABALTICA M.D.;
MARK MORRISEY; KAREN THOMAS; KELLY ANDERSON;
RIANCA WASHINGTON; JOHN DOE, Individually and in his
Official Capacities and JANE DOE, Individually and in her
Official Capacities, Jointly and Severally,

                                Defendants.

Case No.
Honorable

> **PLAINTIFF'S COMPLAINT AND DEMAND FOR A JURY TRIAL**

---

TODD F. FLOOD (P58555)
Flood Law, PLLC
155 W. Congress, Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
*Attorney for Plaintiff*

---

## <u>COMPLAINT AND DEMAND FOR A JURY TRIAL</u>

      NOW COMES Plaintiff, ELAINE ANDERSON, Individually and as Personal

Representative of the ESTATE OF DAVID CORTEZ JUNIOR WRIGHT, Deceased, by and

through her attorneys and FLOOD LAW, PLLC, and for her Complaint, states the following:

## <u>INTRODUCTION</u>

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Decedent, DAVID CORTEZ JUNIOR WRIGHT's, and PLAINTIFF's rights as secured by the United States Constitution.

2.      The events that gave rise to this Complaint began on July 18, 2021, and culminated in the tragic and preventable death of David Cortez Junior Wright, a mentally disabled man suffering from Parkinson's disease, on November 20, 2021. All named Defendants caused the death of Mr. Wright by continuously violating his constitutional rights.

3.      David Cortez Junior Wright was a vulnerable individual with significant medical needs who was failed by a system that ignored his deteriorating condition and denied him the basic dignity and care to which he was entitled while in detention at the Berrien County Jail in St. Joseph, Michigan.

4.      David Cortez Junior Wright seeks relief for the Defendants' violations of his rights under the Eighth and Fourteenth Amendment to the United States Constitution. Plaintiff seeks money damages, an award of costs, interest, and attorney fees, and such other and further relief this Court deems just and proper – for the failure to provide adequate medical care to a mentally impaired inmate with a severe neurological disorder.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of this action under the provisions of 28 U.S.C. § 1331, 1343, and 42 U.S.C § 1983, this being an action seeking redress for the violation of the Plaintiff's constitutional and civil rights.

6.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and against all parties that are so related to claims

in this action, within the original jurisdiction of this Court, that they form part of the same case or controversy.

7.     This Court has personal jurisdiction over all of the named Defendants because they either reside in the State of Michigan and/or do systematic and continuous business in Michigan.

8.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because all of the Defendants reside or are administratively located within the Western District of Michigan, and the events giving rise to this claim occurred within the boundaries of the Western District of Michigan.

## PARTIES

### A.    Plaintiff

9.     Plaintiff, ELAINE ANDERSON, the mother of Decedent David Cortez Junior Wright, is a resident of the County of Berrien, State of Michigan. Plaintiff is the duly appointed Personal Representative of the ESTATE OF DAVID CORTEZ JUNIOR WRIGHT (hereinafter referred to as "ESTATE") in the Berrien County Probate Court and files this lawsuit in both his individual and his representative capacity.

10.     Decedent, DAVID CORTEZ JUNIOR WRIGHT (hereinafter "Mr. Wright"), was a 42-year-old man that was incarcerated at the Berrien County Jail at the times of the events at issue in this case.

### B.    Berrien County Defendants

11.     At all times relevant to this lawsuit, Defendant, COUNTY OF BERRIEN (hereinafter referred to as "BERRIEN COUNTY"), is a political subdivision of the State of Michigan duly organized and carrying out governmental functions pursuant to the laws of Michigan, one of the functions being to organize, operate, staff, and supervise its detention center commonly known as the Berrien County Jail (hereinafter referred to as "BCJ").  Defendant

BERRIEN COUNTY was, at all times relevant to this matter, the public employer of the Individual Defendant-Deputies (hereinafter collectively or individually referred to as "BCJ Officer(s)") named in this Complaint.

12.    At all times relevant to this lawsuit, Defendant, SHERIFF LEONARD P. BAILEY (hereinafter referred to as "BAILEY"), believed to be a resident of the State of Michigan, was the Sheriff of Defendant BERRIEN COUNTY and represented the ultimate source of law enforcement power in BCJ. BAILEY was acting within the scope of his employment and under color of state law in his official capacity and is being sue in his official capacity as policymaker and Sheriff.

13.    At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, Defendant BAILEY had the charge and custody of BCJ and formulated and oversaw policies, practices, regulations, protocols, and customs therein and had the authority for hiring, screening, training, supervising, and disciplining deputies, corrections officers, and medical staff.

14.    At all times relevant to this lawsuit, Defendant, CAPTAIN CELINA HERBERT (hereinafter referred to as "HERBERT"), believed to be a resident of the State of Michigan, was the Jail Administrator of BCJ and represented the ultimate repository of law enforcement power in BCJ. HERBERT was acting within the scope of her employment and under color of state law in her official capacity and is being sued in her official capacity as policymaker and Jail Administrator.

15.    At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, HERBERT had the charge and custody of BCJ and formulated and oversaw policies, practices, regulations, protocols, and customs therein and had

the authority for hiring, screening, training, supervising, and disciplining deputies, corrections officers, and medical staff.

16.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, SERGEANT JACOB WILL (hereinafter referred to as "WILL"), believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant WILL was acting under the color of state law.

17.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY CHRISTINE CIPRIANO (hereinafter referred to as "CIPRIANO"), believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant CIPRIANO was acting under the color of state law.

18.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY MARK BOELCKE (hereinafter referred to as "BOELCKE") believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant BOELCKE was acting under the color of state law.

19.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY BRITTANY ZABEL (hereinafter referred to as "ZABEL") believed to be a resident of the State of Michigan, was an agent or employee of

Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant ZABEL was acting under the color of state law.

20.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY KENDRA WARMAN (hereinafter referred to as "WARMAN") believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant WARMAN was acting under the color of state law.

21.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY NICHOLAS JEWELL (hereinafter referred to as "JEWELL") believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant JEWELL was acting under the color of state law.

22.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY EDWARD KEHOE (hereinafter referred to as "KEHOE") believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant KEHOE was acting under the color of state law.

23.     At all times relevant to this lawsuit, including but not limited to the dates of July 18, 2021, through November 20, 2021, DEPUTY RYAN SCIENSKI (hereinafter referred to as

"SCIENSKI") believed to be a resident of the State of Michigan, was an agent or employee of Defendant BERRIEN COUNTY, and was responsible for protecting Mr. Wright's constitutional right to be free from cruel and unusual punishment during his detention at BCJ. At all material times, Defendant SCIENSKI was acting under the color of state law.

24.     At all times relevant to this lawsuit, Defendants JOHN/JANE DOE DEPUTIES to be specifically identified during the litigation process, were employees of Defendant BERRIEN COUNTY and are believed to be residents and/or administratively located in the Western District of Michigan. When the identities of these individual deputies who inflicted constitutional violations against Plaintiff-Decedent Mr. Wright become known, Plaintiff will amend this Complaint by naming those parties identified in discovery as proper Defendants.

### C.    Corporate Defendant and Individual Medical Providers

25.     Upon information and belief, WELLPATH, LLC (hereinafter referred to as "WELLPATH"), was the only corporate entity with which Defendant BERRIEN COUNTY contracted, and or/with which subcontracts were made, to provide medical care and/or medical services to inmates at BCJ during the period in question.

26.     At all times relevant to the events at issue in this case, WELLPATH, formerly known as Correct Care Solutions was a Tennessee corporation, licensed to do business in the State of Michigan, under contract with Defendant BERRIEN COUNTY to furnish medical care to inmates incarcerated in the BCJ. In its capacity as contractor to Defendant BERRIEN COUNTY, Defendant WELLPATH promulgated rules, regulations, policies, and procedures for the medical screening, medical treatment, and overall medical care of inmates at the BCJ, including Plaintiff-Decedent Mr. Wright. Defendant WELLPATH's policies were implemented by and through its

employees including the individual Defendant medical care personnel, who were responsible for the medical care of the inmates at BCJ.

27.    In Defendant WELLPATH's capacity as contractor and/or subcontractor to Defendant BERRIEN COUNTY, through Berrien County Sheriff's Office, Defendant WELLPATH was, at all times relevant hereto, acting under color of law, considered a "person" and is properly sued under 42 U.S.C. § 1983.

28.    Upon information and belief, at all material times herein, REX CABALTICA, M.D. (hereinafter referred to as "DR. CABALTICA"), was the Chief Medical Director of BCJ, believed to reside in the Western District of Michigan, and at all times relevant to this lawsuit was an agent, employee, and/or subcontractor of corporate Defendant WELLPATH or BERRIEN COUNTY, and was responsible for providing medical care to Plaintiff-Decedent Mr. Wright during his detention at BCJ. At all times relevant to this lawsuit, DR. CABALTICA was acting under the color of state law. He is sued individually and in his official capacity as Chief Medical Director for Defendant WELLPATH.

29.    In addition to acting deliberately indifferent to Mr. Wright's serious medical needs, DR. CABALTICA, as a supervisory official, implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of offending subordinate medical providers.

30.    Upon information and belief, at all material times herein, MARK MORRISEY (hereinafter referred to as "MORRISEY"), was the Regional Manager for Wellpath Healthcare, believed to reside in the Western District of Michigan, and at all times relevant to this lawsuit was an agent, employee, and/or subcontractor of corporate Defendant WELLPATH, and was responsible for supervising the medical care to Plaintiff-Decedent Mr. Wright during his detention at BCJ. At time all times relevant to this lawsuit, Defendant MORRISEY was acting under the

color of state law. He is sued individually and in his official capacity at the Regional Manager for Defendant WELLPATH.

31. Upon information and belief, at all material times herein, KAREN THOMAS (hereinafter referred to as "THOMAS"), believed to reside in the Western District of Michigan, and at all times relevant to this lawsuit was an agent, employee, and/or subcontractor of corporate Defendant WELLPATH or BERRIEN COUNTY, and was the Health Services Administrator and Director of Nursing responsible for general oversight and management of the medical department within BCJ. At all times relevant to this lawsuit, THOMAS was acting under the color of state law. She is sued individually and in her official capacity as policymaker, Director of Nursing, and Health Services Administrator.

32. Defendant KELLY ANDERSON, believed to reside in the State of Michigan, was an agent, employee, and/or subcontractor of Corporate Defendant WELLPATH, and was responsible for providing medical care to Plaintiff-Decedent Mr. Wright during his detention at the BCJ. At all material times, this Defendant was acting under color of state law.

33. Defendant RIANCA WASHINGTON, believed to reside in the State of Michigan was an agent, employee, and/or subcontractor of Corporate Defendant WELLPATH, and was responsible for providing medical care to Plaintiff-Decedent Mr. Wright during his detention at BCJ. At all material times, this Defendant was acting under the color of state law.

34. At all times relevant to this lawsuit, Defendants JOHN/JANE DOE medical providers and/or medical clinicians to be specifically identified during litigation processes, were employees of BERRIEN COUNTY and/or WELLPATH and provided nursing and/or medical care services to inmates at the BCJ, including, but not limited to, Plaintiff-Decedent Mr. Wright, and are believed to be residents and/or administratively located in within the Western District of

Michigan. When the identities of these individual medical providers and/or clinicians who inflicted constitutional violations against Plaintiff-Decedent Mr. Wright become known, Plaintiff will amend this Complaint by naming those parties identified in discovery as proper defendants.

35.    By the conduct, acts, and omissions complained of herein, the individual medical provider Defendants acted with a deliberate indifference to a serious medical need and violated clearly established constitutional standards under the Eighth and Fourteenth Amendments to the United States Constitution by failing to protect Mr. Wright from risk of harm.

## BACKGROUND FACTS

36.    Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

37.    On July 18, 2021, Mr. Wright, a 42-year-old man with mental disabilities and advanced Parkinson's disease, was arrested by the Benton Township Police Department and transported to BCJ.

38.    BCJ and WELLPATH have a policy in place in which an inmate must be screened upon entering the jail. A "receiving screening" report is completed for each inmate, listing the inmate's medical history under a "patient problem list." This policy is reflective of the National Commission on Correctional Health Care's ("NCCHC") Policy J-E-02.

39.    According to NCCHC Policy J-E-02, one of the four main purposes of a receiving screening is to identify and meet any known or easily identifiable health needs that require medical intervention.

40.    WELLPATH inputs an inmate's "receiving screening," and all subsequent medical information and/or documents obtained while incarcerated at BCJ into an Electronic Record

Management Application ("ERMA"). Medical staff must chart and document each subsequent interaction with the inmate through ERMA.

41.    Pursuant to the NCCHC Policy J-E-04, an inmate must then have an initial health assessment within 14 days of admission into BCJ, where the receiving screen report is reviewed, and specific problems are integrated into a problem list. NCCHC Policy J-E-04 notes that "[i]t is important to review past health records, including those from community medical … providers. If these records have not been requested at the time of the initial health assessment, they should be requested after receiving a signed release from the inmate."

42.    Each time an inmate's medical chart is pulled up on ERMA, the inmate's medical history, identified at the receiving screening and integrated into a "problem list" at the initial health assessment, will always pop up on the screen.

43.    Mr. Wright's receiving screening was conducted on July 18, 2021. His Intake Screening Forms indicate he disclosed his history of Parkinson's disease, incontinence, the pain he was currently experiencing, and a previous traumatic brain injury.

44.    During Mr. Wright's receiving screening, Defendant THOMAS further noted several abnormalities in his condition, including but not limited to the following:

a.    Reporting that Mr. Wright's appearance was abnormal, characterized by sweating, tremors, anxiety, disheveled, and/or evidence of trauma;

b.    Reporting that Mr. Wright's movement was restricted due to body deformities, physical abnormalities, and/or an unsteady gait;

c.    Indicating that Mr. Wright's thought process did not make sense;

d.    Noting that Mr. Wright's speech was slurred and slowed;

e.    Describing Mr. Wright's mood as "[d]epressed;" and,

   f.  Describing Mr. Wright's activity and behavior as "slow" and "lethargic."

45. Further, Mr. Wright's problem list included a history of Chronic Neurological and Muscular/Skeletal issues.

46. From the moment of his intake, it was clear that Mr. Wright required close and continuous medical supervision. Despite his placement in the medical observation housing unit at BCJ, he was still deprived of the attentive oversight that could have and should have detected his rapidly deteriorating condition.

47. In the initial weeks of Mr. Wright's detention, WELLPATH medical staff documented several observations regarding his significant health challenges and implemented certain precautionary measures, including but not limited to the following:

   a.  Ordering a hospital bed from Airway Oxygen;

   b.  Providing incontinence supplies, including diapers;

   c.  Providing a shower chair;

   d.  Regularly changing Mr. Wright's bed linens following incidents of incontinence;

   e.  Advising Mr. Wright to reposition himself periodically to prevent skin breakdown; and,

   f.  Installing bed siderails to prevent Mr. Wright from rolling out of bed and being unable to independently get up.

48. Throughout the following months, Mr. Wright's medical records reveal numerous entries by WELLPATH medical staff and BCJ Officers, consistently documenting his severe and progressively declining condition, as well as his repeated need for assistance, including but not limited to the following:

a.    On July 23, 2021, Defendant ANDERSON found Mr. Wright laying on the floor beside his bed, unable to lift himself due to his Parkinson's disease. Defendant ANDERSON called unidentified BCJ Officer's to lift Mr. Wright back onto his bed.

b.    On July 26, 2021, WELLPATH Nurse Christa Delojsi recorded that Mr. Wright "needed considerable assistance to sit up in bed" and had recently rolled out of bed, sustaining a back injury that left him unable to stand or walk to his cell door to receive his medications. Nurse Delojsi thereafter was required to enter Mr. Wright's cell to administer his medications directly.

c.    On August 1, 2021, Defendant THOMAS "assisted [Mr. Wright] out of bed by putting [his] feet over [the] edge of the bed and pulling him to an upright seated position and after a short rest period assisted him to his feet."

d.    On August 11, 2021, Defendant THOMAS noted Mr. Wright's continued complaints of unrelieved pain and his concerns that his medications were not providing relief.

e.    On August 11, 2021, WELLPATH Nurse Mary Coyle noted that Mr. Wright had tremors associated with Parkinson's disease.

f.    On August 15, 2021, Mr. Wright conveyed to Defendants WILL and THOMAS that he "could not get up and needed assistance."

g.    On August 19, 2021, WELLPATH medical staff member Eileen Wagner (hereinafter referred to as "Ms. Wagner") documented that Mr. Wright was

found lying in bed, calling out for help, reporting that his "legs [were] twisted."

h. On August 28, 2021, Defendant THOMAS was required to request the assistance of an unidentified BCJ Officer to facilitate the repositioning of Mr. Wright into a seated position, administer his medications, and subsequently assist Mr. Wright in rising to a standing position in order to change his bed linens.

i. On August 29, 2021, Defendant THOMAS had to assist Mr. Wright by opening a milk container and providing new adult diapers.

49. As evidenced by the BCJ Medical Records referenced above, Defendants were frequently required to physically life Mr. Wright from the ground and return him to his bed, a direct result of his immobility caused by Parkinson's disease.

50. Defendants were undoubtedly aware of Mr. Wright's need for attentive, specialized care. Mr. Wright was dependent on adult diapers, his bedding and clothing needed daily changes due to frequent urination, and he required assistance with basic tasks such as opening food items, as his hands remained in a "cupped" fixed position and his arms trembled continuously.

51. Recognizing these limitations, WELLPATH Medical Staff member Esther Mbungu instructed Mr. Wright to "call for help" should he require assistance due to his restricted mobility and significant physical challenges resulting from his Parkinson's disease.

52. Mr. Mbungu's instructions, while superficially plausible, quickly proved futile as Defendants repeatedly began to ignore Mr. Wright's dire calls for help.

53. Within a month of Mr. Wright's detention, Defendants' level of care deteriorated markedly, as evidenced by frequent neglect of his calls for assistance, extended periods during

which he was left in compromised and unsafe positions, and repeated failures to administer his prescribed medications, including but not limited to the following incidents:

a.    On August 15, 2021, Defendant THOMAS requested assistance from BCJ Officers to enter Mr. Wright's cell and administer his medications. Defendant WILL, however, instructed Defendant THOMAS that they were not to enter the dorm and directed her to mark the medications as refused in the medical records, despite Mr. Wright informing Defendant WILL that he was unable to get up to retrieve his medications from the cell door slot.

b.    On August 19, 2021, WELLPATH medical staff member Ms. Wagner noted that Mr. Wright was in bed yelling for help up and thereafter marked that Mr. Wright had refused his medications.

c.    On August 29, 2021, Defendant THOMAS requested assistance from BCJ Officers to enter Mr. Wright's cell to help feed him and help him get up out of bed but was told by BCJ Officers they were unable to come. Approximately an hour later, Defendant THOMAS again requested BCJ Officers' assistance to enter Mr. Wright's cell to administer his prescribed medications and assist him up, only to be told once more that no assistance could be provided. It was not until later that morning that BCJ Officers finally responded, allowing Defendant THOMAS to assist Mr. Wright with getting up and taking his medications.

d.    On October 1, 2021, Defendant THOMAS discovered Mr. Wright lying on the floor near his in-cell toilet. Mr. Wright reported that he had been calling for help. Unable to lift Mr. Wright herself, Defendant THOMAS requested

assistance from an unidentified male BCJ Officer. The BCJ Officer refused, stating he would not help assist Mr. Wright and advised Defendant THOMAS to find another WELLPATH nurse instead.

e.    On November 16, 2021, Wellpath Nurse Tamara Scheppelman found Mr. Wright lying on the floor, screaming for help. When Nurse Scheppelman requested Defendant KEHOE's assistance in helping Mr. Wright back to his bed, Defendant KEHOE responded that he was told to never touch Mr. Wright.

54.    Upon information and belief, it quickly became common practice among BCJ Officers to refrain from unlocking Mr. Wright's cell if he did not physically present himself at the door during medication rounds. Furthermore, BCJ Officers routinely failed to assist WELLPATH medical staff in helping Mr. Wright to his feet, instead opting to leave him in vulnerable and compromised positions. In fact, an unidentified BCJ Officer asserted that assisting Mr. Wright physically would and/or could cost him his job at BCJ.

55.    Review of BCJ surveillance video from the twenty-four (24) hours preceding Mr. Wright's death reveal that he displayed a range of symptoms commonly associated with an advanced stage of Parkinson's disease, including but not limited to the following:

a.    Short, slow, and shuffling steps;

b.    A stooped and/or hunched posture;

c.    Difficulty with balance and coordination;

d.    Instability and wobbling; and,

e.    Uncontrollable tremors in his hands and/or arms.

56.     Beginning on the morning of November 19, 2021, in-cell surveillance footage shows Mr. Wright making repeated attempts to rise from his bed, visibly struggling due to the progression of his Parkinson's disease. The footage shows Mr. Wright attempting to shuffle toward his cell door; his short, unsteady steps repeatedly causing him to lose balance and fall against the walls of his cell.

57.     Later that day, at approximately 2:17 PM, a wheelchair was brought to Mr. Wright's cell for transport to court. WELLPATH staff assisted Mr. Wright in changing his diaper, helped him into a fresh jumpsuit, and then wheeled him out.

58.     Approximately an hour and a half hour later, Mr. Wright was returned to his cell, having pled guilty to charges of Criminal Sexual Conduct in the 2nd degree. Mr. Wright's sentencing was to occur at a later date. Shortly after being returned to his cell, at approximately 4:39 PM, Mr. Wright laid down to rest appearing to be sleeping sideways on his in-cell twin bed. **See Exhibit 1, Photo 1.** Mr. Wright never gets up again.

59.     At approximately 5:37 PM, Mr. Wright shifts his position, angling his body so that his head is now positioned closest to the cell door. **See Exhibit 1, Photo 2.**

60.     Over the next several hours, Mr. Wright is observed making only slight, lethargic movements, accompanied by severe tremors consistent with the progression of his Parkinson's disease.

61.     Notably, a review of BCJ video surveillance from November 19, 2021, at 4:39 PM, until Mr. Wright's death on the morning of November 20, 2021, reveals over twenty (20) various levels of contact by Defendants' BCJ Officers and WELLPATH staff, including but not limited to the following:

**November 19, 2021**

17

a.    At 5:01 PM, Defendant Nurse WASHINGTON looked through Mr. Wrights cell window. Shortly thereafter, Defendant Nurse ANDERSON arrived for her shift.

b.    At 5:56 PM, Defendant BOELCHE threw a sack supper into Mr. Wright's cell. At this time, Mr. Wright was lying on his left side, with his right arm draped over the railing of his medical bed. Mr. Wright appeared to be in acute discomfort, attempting to shift from his left side to his back, and then back to his left side, before sliding off the bed at approximately 6:04 PM. From 6:04 PM onward, Mr. Wright remained in a precarious position, his torso wedged between the bed and its railing, while his legs and knees were on the floor with his right arm remaining draped over the bed railing. **See Exhibit 1, Photo 3.**

c.    At 6:10 PM, Defendant WASHINGTON completed her shift, taking a brief look into Mr. Wright's cell before leaving for the night.

d.    At 7:25 PM, Defendant CIPRIANO walked through the medical corridor and looked into Mr. Wright's cell.

e.    At 9:07 PM, Defendant CIPRIANO danced through the medical hallway during her hourly rounds, making a cursory glance towards Mr. Wright's cell.

f.    At 9:09 PM, Defendant Nurse ANDERSON approached Mr. Wright's cell, tapped on the window, and appeared to talk for approximately forty-five (45) seconds. During the investigation into Mr. Wright's death, Defendant ANDERSON reported to investigators that Mr. Wright did not receive his

prescribed medications at this time, as no BCJ Officers were available to assist her. Defendant ANDERSON further explained to investigators that at this time Mr. Wright was positioned half on his bed, making verbal contact with her. Defendant ANDERSON told investigators that during this interaction, Mr. Wright stated, "I can't get up, I can't get up," and "I can't get my arm from under me." Defendant ANDERSON reportedly informed Mr. Wright that she would return again and instructed him to reposition himself by her next visit. Defendant ANDERSON admitted to refusing Mr. Wright's request to lower the bed rail to help him free himself, ultimately leaving him in the same compromised position in which he would later be found unresponsive in.

g.    At 10:05 PM, Defendant BOELCHE glanced briefly into Mr. Wright's cell.

h.    At 10:49 PM, Defendant ANDERSON once again looked through Mr. Wright's cell window and saw that he remained in the same compromised position, once again verbally pleading for help, stating, "I need help, I need help." In subsequent statements to investigators, Defendant ANDERSON claimed to have provided Mr. Wright with verbal instructions on how to "pull himself up," claiming she repeated the same repositioning instructions she allegedly gave him earlier in the evening. Notably, however, surveillance footage captures Defendant ANDERSON at Mr. Wright's cell door for less than two (2) seconds, with no visible attempt to communicate observed.

i.      At 11:20 PM, Defendant Deputies ZABEL, WARMAN, JEWELL, and KEHOE conducted hourly rounds through the medical corridor. Defendant ZABEL and WARMAN briefly glanced into Mr. Wright's cell.

**November 20, 2021**

j.      At 12:33 AM, Defendant Nurse ANDERSON documented in Mr. Wright's BCJ Medical Chart that he had refused two (2) of his prescribed medications. Defendant ANDERSON, however, was never observed attempting to administer medications to Mr. Wright at that time. In fact, surveillance footage from the medical corridor reveals that Defendant ANDERSON did not check on Mr. Wright for over four (4) hours following her last brief glance, during which he had pleaded for help and she falsely claimed to have provided assistance.

k.      At approximately 12:27 AM, Mr. Wright's breathing is observed to become increasingly labored, accompanied by severe tremors in his arms and/or hands.

l.      At 12:39 AM, Defendant WARMAN conducted another routine walk-by glance towards Mr. Wright's cell during hourly rounds. At this time, Mr. Wright is having severe tremors and remains in the same compromised position.

m.      Between 1:00 AM and 1:24 AM on November 20, 2021, Mr. Wright appears to make his last discernable movement.

n.    At 1:44 AM, Defendant ZABEL performed his hourly rounds and glances into Mr. Wright's cell. At this time, Mr. Wright's head had fallen onto the bed, and he remained in the same distressing position.

o.    At 2:49 AM, Defendant WARMAN briefly looked through Mr. Wright's cell window during hourly rounds. At this time, Mr. Wright's head remained on his bed.

p.    At 3:27 AM, Defendant Nurse ANDERSON looked through the window of Mr. Wright's cell for approximately eight to nine (8-9) seconds. Defendant ANDERSON later acknowledged to investigators that she had noticed Mr. Wright was still positioned in the same manner she had allegedly instructed him to move from four (4) hours earlier. Upon information and belief, Mr. Wright had been deceased for several hours by this time.

q.    At 3:43 AM, Defendant WARMAN again walked by Mr. Wright's cell during his hourly rounds. Mr. Wright remained in the same position, unresponsive and motionless.

r.    At 4:46 AM, Defendant ZABEL slid court papers under the door of Mr. Wright's cell. After doing so, Defendant ZABEL glanced through the window of Mr. Wright's cell, hesitated for a moment, and then looked back for approximately ten (10) seconds before walking off.

s.    At 5:35 AM, Defendant KEHOE passed through the medical corridor but failed to look into Mr. Wright's cell. Moments later, Defendant JEWELL followed behind, passing by Mr. Wright's cell and only slightly turning his

head towards the door as he walked past, making no meaningful observation or intervention.

t.      Around 6:13 AM, Defendant Nurse ANDERSON concluded her shift, and Defendant Nurse WASHINGTON began hers. Defendant ANDERSON told investigators that she was "sure" she had informed Defendant WASHINGTON that she had checked on Mr. Wright and that he remained in the same position. When further questioned about whether she had personally checked on Mr. Wright on the way out of her shift, Defendant ANDERSON insisted she had, claiming, "I'm pretty OCD on him." A review of the surveillance footage from the BCJ medical corridor, however, reveals a stark contradiction: as Defendant ANDERSON left the medical room, she walked directly toward the exit, bypassing Mr. Wright's cell entirely, despite it being located just behind her. In fact, that last time she had observed Mr. Wright before leaving her shift was nearly three (3) hours earlier.

u.      At 6:18 AM, Defendant KEHOE passed through the medical corridor and briefly glanced at Mr. Wright's cell without breaking his stride or slowing his pace.

v.      At 6:34 AM, Defendants' KEHOE and JEWELL entered the medical corridor together, both giving cursory glances towards Mr. Wright's cell as they walked by.

w.      At 6:37 AM and 7:02 AM, Defendant Nurse WASHINGTON passed by Mr. Wright's cell with the medication cart but did not look into his cell.

x.    At approximately 7:25 AM, Defendant SCIENSKI entered Mr. Wright's cell to deliver his breakfast. Upon entering, Defendant SCIENSKI observed Mr. Wright on his knees with his upper body on the bed in an unnatural positioning. Despite the troubling manner in which Mr. Wright was positioned, Defendant SCIENSKI placed the breakfast tray on the in-cell sink, exited the cell, and closed the door behind him.

y.    After closing Mr. Wright's cell door, Defendant SCIENSKI looked through the cell window for approximately fifteen (15) seconds. Defendant SCIENSKI then re-opened the door and stood in the entryway of the cell for another five (5) seconds before re-entering Mr. Wright's cell at 7:26 AM and standing at the head of the bed for approximately sixty (60) seconds. During this time, Defendant SCIENSKI appears to be speaking, as his mask is observed moving. Mr. Wright remains completely still and unresponsive. **See Exhibit 1, Photo 4.** Defendant SCIENSKI, after observing Mr. Wright's deceased body and inability to speak back to him, left Mr. Wright's cell without further inquiry and resumed his normal duties. Subsequently, Defendant WILL reported to Officer Thad Chartrand, who was conducting a jail investigation for the Berrien County Sheriff's Department, that Defendant SCIENSKI claimed to have spoken with Mr. Wright during the aforementioned interaction, despite Mr. Wright having been deceased for several hours prior.

z.    At 8:03 AM, Deputy Abigail Pifer walked past Mr. Wright's cell and gave a cursory glance through the window.

62.    Over sixteen (16) hours after Mr. Wright had first laid down, and nearly eight (8) hours after his last discernable movement, Defendant Nurse WASHINGTON and Defendant Sergeant WILL entered Mr. Wright's cell at 8:57 AM on November 20, 2021, to administer his medications. Upon entering, Defendants' discovered Mr. Wright unresponsive in the same compromised position he had been in for hours – on his knees, with his torso wedged between the bed and its railing. Mr. Wright's body was cold and stiff with no detectable pulse. A sack supper remained untouched on the floor of the cell at the head of the bed. **See Exhibit 1, Photo 5**. Emergency Medical Services was called, and Mr. Wright was pronounced deceased.

63.    Subsequently, Defendants WASHINGTON and WILL moved Mr. Wright to the floor of his cell. **See Exhibit 1, Photo 6**. After a brief inspection, Defendant WASHINTON checked his pulse. No attempts to administer CPR or any other life-saving measures were documented.

64.    An autopsy was subsequently conducted by the county medical examiner. The cause of death was determined to be sequelae of remote traumatic brain injury, with contributing causes of Parkinson's disease. The manner of death was ruled indeterminate.

65.    Following Mr. Wright's death, two inmates housed in the medical wing provided the below written statements detailing their observations of the events leading up to Mr. Wright's death:

  a. "[On] Friday Afternoon, [s]omeone down the hall, who's name is [D]avid I believe, kept screaming for help till night time is when his screaming started to sound like he was drowning in his own saliva. Soon after that it stopped, I didn't think anything of it because I thought someone attended it." [sic].

b.    "I … have heard a man screaming for help everyday for a week then some time last night (11-19-21) the yelling stopped. This morning (11-20-21) I seen 6 of the C.Os go past our dorm around 8:30 am then about an hour later the parametics came thats when the C.Os covered our door window and we heard one of the C.Os telling the paramedic that they talked to the guy at 8:30 am." [sic].

66.    Furthermore, Nurse Scheppelman, who worked the night before Mr. Wright's death recalled that Mr. Wright's only request was simply to be helped back into bed. Nurse Scheppelman remarked, "you could simply sit in medical and hear [Mr. Wright] scream for hours. Screaming for help from anyone."

67.    Even though Defendants' own records and the BCJ surveillance video itself demonstrates that the Defendants named were aware of a serious risk of harm to Mr. Wright's health, and due to the obviousness of that risk that even a layperson would have recognized, these Defendants must have inferred that a substantial risk of harm to Mr. Wright existed, but made a conscious decision to disregard that risk.

68.    By reason of the Defendants' individual conscious decisions, all of which were so obviously consistent and seemingly collective, these Defendants left Mr. Wright to die rather than summon emergency medical care to save his life.

69.    This lack of any meaningful medical care occurred simultaneously with Mr. Wright lying wedged between his bed and its railing for almost eight (8) hours, with Mr. Wright attempting just a few moments of lethargic movement. During the last day of his life, Mr. Wright lay completely immobile, twitching and writhing in obvious pain and discomfort, and suffering involuntary oscillations of his arms appearing to be tremors associated with his Parkinson's

disease. Mr. Wright's suffering occurred as these Defendants danced by his cell merely casting cursory glances threw his cell window, seeing him stuck in the same position again and again, watching and doing nothing to save Mr. Wright from the death caused by their deliberate indifference.

70.     The reckless, deliberate indifference of these Defendant Officers and Defendant medical personnel demonstrates the constitutionally deficient corrections and medical training that these Defendants were provided by Defendant BERRIEN COUNTY, Defendant WELLPATH, and their respective supervisors and policymakers. The complete failure of these corrections officers and medical personnel to react to an obvious, long-term risk of serious harm to Mr. Wright is an individual failure to act that was a highly obvious and predictable consequence of inadequate training by Defendant Sheriff BAILEY, Captain HERBERT, DR. CABALTICA, MORRISEY, and THOMAS, all of whom held supervisory and policymaker positions within BERRIEN COUNTY and/or WELLPATH.

71.     As the BCJ Medical Log's clearly show, during the final month of Mr. Wright's life, Mr. Wright's complaints occurred weekly, if not daily, and demanded the Defendants' individual and collective reaction to provide necessary medical care that Mr. Wright rarely received, such inaction thereby resulting in his death on the morning of November 20, 2021.

72.     Each of these Defendants named above were aware, individually and collectively, of the serious medical needs of Mr. Wright and were aware of the serious risk of harm to Mr. Wright, the awareness being demonstrated by:

      a.    The personal contacts they had with Mr. Wright from July 18, 2021, to July 20, 2021;

b. Their receipt of Mr. Wright's medical records, which clearly documented his history of Parkinson's disease;

c. The multiple requests made by Mr. Wright for assistance;

d. The direct visual observations of Mr. Wright's physical state;

e. Reports and verbal interactions from other staff members;

f. The twenty-four (24) hour surveillance footage of Mr. Wright's cell; and,

g. The BCJ Records.

73. Upon information and belief, Mr. Wright's death sparked significant unease within BCJ, particularly among the named Defendants who were acutely aware of the repeated violations of Mr. Wright's constitutional rights. For instance, Defendant THOMAS voiced her concerns to other WELLPATH employees, recalling retrospectively that she had concerns about Mr. Wright's treatment and the Defendant BCJ Officer's duty to open Mr. Wright's cell door when his Parkinson's symptoms left him unable to reach the door for his medications. Defendant THOMAS went as far as to admit that she "knew" her subordinate, Defendant ANDERSON, "didn't do anything for David after seeing him for hours on his knees next to his hospital bed," and that "David deserved better than he got."

74. Upon information and belief, Defendant ZABEL, cognizant of the risk of liability associated with the egregious neglect Mr. Wright suffered, confided that she "felt her ass [was] on the line that night."

75. Consequently, the above-named Defendants failed to provide Mr. Wright with adequate medical care, directly resulting in his death.

<u>**COUNT I**</u>
**VIOLATION OF CIVIL RIGHTS PURSUANT TO TITLE 42 U.S.C. § 1983**
**Violation of Plaintiff-Decedent's Eighth and Fourteenth Amendment Rights – Official**

**Policy, Practice, Custom; Final Policymaker; Ratification; Failure to Train and Supervise**
*Against Defendant Berrien County, Defendant Bailey, and Defendant Herbert*

76.　　Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the foregoing paragraphs as if set forth fully herein.

77.　　At all times relevant hereto, Defendant BAILEY and HERBERT were final policy makers for BERRIEN COUNTY and were acting within the scope and course of their employment within the County of Berrien and were acting under color of state law with the authority granted them as Sheriff and Jail Administrator, respectively.

78.　　At all times relevant hereto, Mr. Wright had the right to be free from cruel and unusual punishment and to receive proper and adequate medical care while incarcerated and under the custody and control of BERRIEN COUNTY at the BCJ and under the supervision and control of the BCJ Officers pursuant to the Eight and Fourteenth Amendments.

79.　　BERRIEN COUNTY maintained constitutionally deficient policies and procedures that were inadequate to protect inmates from serious medical consequences. The unconstitutional conduct alleged herein was carried out in accordance with the official policies, procedures, and customs of BERRIEN COUNTY.

80.　　BERRIEN COUNTY's well-settled practice and custom of neglecting inmates with serious medical needs, failing to adequately monitor inmates with chronic health conditions, and failing to discipline offenders for the constitutional violations constitutes a standard operating procedure of BERRIEN COUNTY.

81.　　Supervisory officials, BAILEY and HERBERT, had final policymaking authority for BERRIEN COUNTY and had knowledge of the constitutionally deficient policies and procedures at place in BCJ.

82.    Supervisory officials, BAILEY and HERBERT, nevertheless agreed to, approved, and ratified the unconstitutional conduct alleged.

83.    Specifically, BERRIEN COUNTY maintained unconstitutional policies and procedures for managing individuals with serious medical needs, like Mr. Wright and his history of Parkinson's disease.

84.    BERRIEN COUNTY, BAILEY, and HERBERT contracted with WELLPATH to provide medical care and services to inmates at BCJ, and continued to renew WELLPATH's contract even after the company became embroiled in a series of wrongful death lawsuits and had a documented history of delivering substandard medical care.

85.    BERRIEN COUNTY failed to adequately train and/or supervise BCJ Officers and WELLPATH with regard to complying with constitutionally-minimal rights of confined persons to medical care for serious medical needs.

86.    BERRIEN COUNTY had the power and ability to monitor/supervise the performance of WELLPATH and the duty to ensure that jail detainees and/or inmates received constitutionally adequate medical care. BERRIEN COUNTY could take corrective action to ensure compliance with constitutional standards by retaining an outside medical entity to review the medical care provided to inmates by WELLPATH at BCJ, yet deliberately chose not to.

87.    BERRIEN COUNTY was on notice of the deficiencies in providing medical care to its detainees and/or inmates and knew that these deficiencies would likely cause additional injuries, yet deliberately ignored the history of abuse and allowed WELLPATH's ongoing practice of substandard medical care to continue, putting the lives of its inmates at risk.

88.    BERRIEN COUNTY knew that the policies, practices, and custom referenced herein posed a substantial risk of serious harm to inmates with life-threatening medical issues like

Mr. Wright, and it was obvious that such harm would occur. Nevertheless, BERRIEN COUNTY deliberately failed to take reasonable steps to alleviate the risk of harm.

89.    BERRIEN COUNTY, BAILEY, and HERBERT's repeated ratification and/or failure to implement adequate training, supervision, and policies regarding the recognition and treatment of serious medical conditions and the necessity to timely respond to the same constitutes an official policy of BERRIEN COUNTY condoning the conduct at issue and was the moving force behind the death of Mr. Wright.

90.    This custom of continuously tolerating WELLPATH's substandard medical care and deliberately failing to act was the direct and proximate cause of Mr. Wright's death.

91.    The actions cited above violated clearly established constitutional rights of which BERRIEN COUNTY, BAILEY, and HERBERT were aware or should have been aware, namely, the long-established right to be free of cruel and unusual punishment and the right to receive medical care that adequately treats Mr. Wright's serious medical needs, and are therefore not entitled to governmental immunity.

## COUNT II
### VIOLATION OF CIVIL RIGHTS PURSUANT TO TITLE 42 U.S.C. § 1983
### Violation of Plaintiff-Decedent's Eighth and Fourteenth Amendment Rights –
### Official Policy, Practice, Custom; Final Policymaker; Ratification; Failure to Train and Supervise
*Against Defendant Wellpath, Defendant Cabaltica, Defendant Morrisey, Defendant Thomas*

92.    Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the above paragraphs as if set forth fully herein.

93.    At all times relevant hereto, Defendant DR. CABALTICA was the Chief Medical Director for WELLPATH and was acting within the scope and course of his employment within WELLPATH/BERRIEN COUNTY, and under the color of state law with the authority granted to him as Chief Medical Director.

30

94.     At all times relevant hereto, Defendant THOMAS was the Health Services Administrator and the Director of Nursing for WELLPATH and was acting within the scope and course of her employment within WELLPATH/BERRIEN COUNTY, and under the color of state law with the authority granted to her as Health Services Administrator and Director of Nursing.

95.     At all times relevant hereto, Defendant MORRISEY was the Regional Manager for WELLPATH and was acting within the scope and course of his employment within WELLPATH/BERRIEN COUNTY, and under the color of state law with the authority granted to him as Regional Manager.

96.      At all times relevant hereto, Mr. Wright had the right to be from cruel and unusual punishment and to receive proper and adequate medical care while incarcerated and under the custody and control of WELLPATH/BERRIEN COUNTY at the BCJ and under the supervision and control of the foregoing Defendants pursuant to the Eighth and Fourteenth Amendments.

97.     WELLPATH maintained constitutionally deficient policies and procedures that were inadequate to protect inmates from serious medical consequences. The unconstitutional conduct alleged herein was carried out in accordance with the official policies, procedures, and customs of WELLPATH.

98.     WELLPATH's well-settled practice and custom of neglecting inmates with serious medical needs and failing to properly investigate and discipline offenders for the constitutional violations constitutes a standard operation procedure of WELLPATH.

99.     Specifically, WELLPATH, DR. CABALTICA, MORRISEY, and THOMAS failed to investigate several occurrences of inadequate medical care that occurred in the BCJ while WELLPATH was medical provider for inmates at the BCJ.

100.    WELLPATH's well-settled practice and custom of failing to investigate inadequate medical care that occurred within the BCJ and failing to properly discipline offenders for the constitutional violations constitutes a standard operating procedure of WELLPATH.

101.    WELLPATH's failure to investigate the medical care provided by WELLPATH and to investigate the inadequate medical care in BCJ was so closely related to the deprivation of Mr. Wright's rights as to be the moving force that ultimately caused Mr. Wright's death.

102.    Supervisory officials, DR. CABALTICA, MORRISEY, and THOMAS, had final policymaking authority for WELLPATH in BERRIEN COUNTY and had knowledge of the constitutionally deficient policies and procedures.

103.    Supervisory officials, DR. CABALTICA, MORRISEY, and THOMAS, nevertheless agreed to, approved, and ratified the unconstitutional conduct alleged.

104.    Specifically, DR. CABALTICA, MORRISEY, and THOMAS maintained unconstitutional policies and procedures for managing individuals with serious medical needs, like Mr. Wright and his history of Parkinson's disease, including, but not limited to the following:

    a.  Insufficient staffing;

    b.  Failing to administer prescribed medications to inmates and/or detainees with chronic diseases;

    c.  Failing to ensure timely and adequate medical assessments and treatment for inmates with known medical conditions, including Parkinson's disease;

    d.  Implementing or condoning practices that allowed for the denial and/or delay of necessary medication or medical care, especially when an inmate is unable to physically access the medication due to their medical condition;

e.  Failure to provide adequate training to staff, including officers and medical personnel, regarding the specific needs of inmates with chronic medical conditions;

f.  Failing to properly document and respond to inmate medical complaints;

g.  Failure to investigate or take corrective action when complaints about medical care are raised; and,

h.  Adopting a practice of ignoring and/or dismissing clear signs of medical distress, including unresponsiveness or the inability of an inmate to move due to chronic medical conditions.

105.    WELLPATH, DR. CABALTICA, MORRISEY, and THOMAS had knowledge of the unconstitutional policies, procedures, and customs described above and continued to ratify the unconstitutional conduct of its employees, agents, and/or subcontractors.

106.    WELLPATH demonstrated a persistent pattern of unconstitutional conduct toward BCJ inmates by engaging in the practices referenced above and deliberately failed to act on these unconstitutional policies, procedures, and customs.

107.    By ratifying the unconstitutional conduct and deliberately failing to act, WELLPATH directly caused the death of Mr. Wright.

108.    WELLPATH, DR. CABALTICA, MORRISEY, and THOMAS failed to adequately train and/or supervise its personnel with regard to complying with the constitutionally-minimal rights of confined persons to medical care for serious medical needs.

109.    WELLPATH was on notice of the deficiencies in its medical staff at BCJ providing medical care to the detainees and/or inmates and knew that these deficiencies would likely cause

additional injuries, yet deliberately ignored the history of abuse and allowed the ongoing practice of substandard medical care to continue, putting the lives of detainees and/or inmates at risk.

110.    WELLPATH knew that the policies, practices, and customs referenced herein posed a substantial risk of serious harm to detainees and/or inmates with chronic medical issues like Mr. Wright, and it was obvious that such harm would occur. Nevertheless, WELLPATH failed to take reasonable steps to alleviate the risk of harm.

111.    WELLPATH, DR. CABALTICA, MORRISEY, and THOMAS' repeated ratification and/or failure to fully investigate the inadequate medical care of BCJ inmates constitutes an official policy of WELLPATH condoning the conduct at issue and was the moving force behind the death of Mr. Wright.

112.    This custom of continuously tolerating WELLPATH's substandard medical care and deliberating failing to act as the direct and proximate cause of Mr. Wright's death.

113.    WELLPATH had knowledge of the continuous unconstitutional conduct by its untrained personnel, agents, and/or subcontractors and knew that it presented an obvious potential for continued constitutional violations, yet deliberately disregarded it.

114.    WELLPATH's deliberate indifference to these unconstitutional policies and customs, deficiencies in training, its failure to train and supervise its personnel, and agents, and/or subcontractors, and its complete disregard for its history of abuse was the direct and proximate cause of Mr. Wright's death.

115.    The actions cited above violated clearly established constitutional rights of which WELLPATH, DR. CABALTICA, MORRISEY, and THOMAS were aware or should have been aware, namely, the long-established right to be free of cruel and unusual punishment and the right

to medical care that adequately treats Mr. Wright's serious medical needs, and are therefore not entitled to governmental immunity.

## COUNT III
### VIOLATION OF CIVIL RIGHTS PURSUANT TO TITLE 42 U.S.C. § 1983
### Violation of Plaintiff-Decedent's Eighth and Fourteenth Amendment Rights –
### Supervisory Liability
*Against Defendant Cabaltica, Defendant Morrisey, Defendant Thomas, and Defendant Bailey*

116.    Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the above paragraphs as if fully stated herein.

117.    At all times relevant hereto, Defendants DR. CABALTICA, MORRISEY, THOMAS and BAILEY were the supervisory officials responsible for overseeing and managing the operations and staff at the BCJ, including the medical care and treatment provided to inmates. Collectively, they are referred to herein as the Supervisory Defendants.

118.    The Supervisory Defendants oversaw the operations of WELLPATH and the BCJ and had a duty to ensure that subordinate staff followed all applicable policies, rules, medical standards, and legal parameters, and had a further duty to change or update policies when changes became necessary. The Supervisory Defendants failed to adequately train and supervise their subordinate staff. As a result of their failures to supervise, the Supervisory Defendants were deliberately indifferent to Mr. Wright's serious medical needs and his rights under the Eight and Fourteenth Amendments of the United States Constitution in one or more of the follow particulars:

a.  Failing to ensure constitutionally adequate monitoring of inmates and/or detainees, particularly those with serious medical needs;

b.  Failing to ensure the coordination of care between medical providers and BCJ Officers;

c.  Relying on inadequately trained BCJ Officers to conduct medical monitoring of inmates and detainees;

d.  Failing to administer prescribed medications to inmates and/or detainees with chronic diseases;

e.  Failing to ensure timely and adequate medical assessments and treatment for inmates with known medical conditions, including Parkinson's disease;

f.  Implementing or condoning practices that allowed for the denial and/or delay of necessary medication or medical care, especially when an inmate is unable to physically access the medication due to their medical condition;

g.  Failing to provide adequate training to staff, including officers and medical personnel, regarding the specific needs of inmates with chronic medical conditions;

h.  Failing to properly document and respond to inmate medical complaints.

i.  Failing to investigate or take corrective action when complaints about medical care are raised; and,

j.  Adopting a practice of ignoring and/or dismissing clear signs of medical distress, including unresponsiveness or the inability of an inmate to move due to medical conditions.

119.    At all times relevant here, Mr. Wright had the right to be free from cruel and unusual punishment and to receive proper and adequate medical care while incarcerated and under the custody and control of BERRIEN COUNTY/WELLPATH and the BCJ and under the supervision and control of the Supervisory Defendants pursuant to the Eighth and Fourteenth Amendments.

120.    The Supervisory Defendants implicitly authorized, approved, or knowingly acquiesced in the constitutionally-deficient medical care provided to Mr. Wright.

121.    The Supervisory Defendants knew, or should have known, that the medical care their subordinates were providing detainees and/or inmates was constitutionally deficient.

122.    The Supervisory Defendants implicitly authorized, approved, or knowingly acquiesced in the actions of their subordinates by failing to discipline, punish, or terminate them for the constitutionally-deficient medical care provided to previous inmates at BCJ, as well as Mr. Wright.

123.    The Supervisory Defendants failed to act to prevent their subordinates from providing inadequate medical care to previous inmates at the BCJ, and Mr. Wright.

124.    The Supervisory Defendants failure to act deprived Mr. Wright of his constitutional rights and was the moving force that ultimately caused Mr. Wright's death.

125.    The actions cited above violated clearly established constitutional rights of which the Supervisory Defendants were aware or should have been aware. Thus, the Supervisory Defendant are not entitled to governmental immunity.

### COUNT IV
### VIOLATION OF CIVIL RIGHTS PURSUANT TO TITLE 42 U.S.C. § 1983
### Violation of Plaintiff-Decedent's Eighth and Fourteenth Amendment Rights –
### Deliberate Indifference
*Against All Defendants*

126.    Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the above paragraphs as if fully stated herein.

127.    At all times relevant hereto, the acts and omissions of actions by all Defendants in their individual and official capacities under the Eight and Fourteenth Amendments to the Constitution, as well as 42 U.S.C. §1983 were all performed under the color of state law and were

unreasonable and performed knowingly, wantonly, with deliberate indifference recklessly, maliciously, and with gross negligence, callousness, and reckless indifference to Mr. Wright's wellbeing and serious medical needs and in reckless disregard to his safety, with wanton intent for Mr. Wright to suffer the unnecessary and reckless infliction of pain and suffering by the failure to obtain medical treatment and failure to properly train, supervise, develop and implement policies and procedures by reason of which Plaintiff is entitled to compensatory and punitive damages.

128.    The conduct of each Defendant and all of its employees, agents, and/or ostensible agents, were acting under the color of state law when they deprived Mr. Wright of his clearly established rights, privileges, and immunities in violation of the Eight and Fourteenth Amendments of the Constitution of the United States, and of 42 U.S.C. §1983.

129.    The conduct of each Defendant was pursuant to, and in execution and implementation of, color of state law and official sanctioned policies, ordinances, regulations or customs of Defendants and each of the named Defendants.

130.    Defendants exhibited deliberate indifference, pursuant to the Eighth and Fourteenth Amendments to the Constitution, to serious medical needs, to-wit:

a.  Failure to provide Mr. Wright with proper and competent medical care and treatment for his serious medical condition.

b.  Failure to recognize that Mr. Wright was not medically stable and was in need of medical treatment.

c.  Failure to conduct regular and adequate in-person checks on Mr. Wright.

d.  Failure to respond to Mr. Wright's medical emergency with timely, lifesaving efforts.

e.   Knowingly and recklessly neglecting Mr. Wright for an extended period of time by not providing him with adequate care creating a serious risk of harm.

f.   Knowingly and recklessly hiring and training as correction officials, jail administrators, physicians, nurses and/or other medical personnel who were not able to determine serious medical conditions which render them unfit to perform the necessary duties of the position.

g.   Knowingly and recklessly failing to discipline, instruct, supervise or control correctional officers, jail personnel, physicians, nurses and/or other medical personnel conduct and thereby encouraging acts and omissions that contributed to the injuries suffered by Mr. Wright.

h.   Recklessly, intentionally and/or willfully denying medical care to an inmate they knew needed serious medical attention.

131.   Defendants personally participated in the implementation, execution, and omission of the official policies, training, ordinances, regulations and/or customs referred to above.

132.   That all officials had a duty to adequately train and supervise; and, all Sherriff Administrations, deputy sheriffs, physicians, nurses and/or other medical personnel to properly care for, obtain medical treatment, supervise and provided care and treatment to Mr. Wright, that was not grossly negligence or that amounted to a reckless indifference to life.

133.   The unconstitutional conducts of the Individual Defendants as alleged herein implemented and executed the following policies and customs of Defendant WELLPATH and BERRIEN COUNTY:

a. Implicit authorization, approval and knowingly acquiescence in the failure to provide necessary medical care, and/or access to care, to include medical treatment, in response to obvious, serious medical needs;

b. The use and acceptance of withholding medical care, including assisting inmates and/or detainees and providing prescribed medications;

c. Failure to discipline or terminate BCJ personnel known to have engaged in the withholding of medical care;

d. Failure to eliminate BCJ policies, practices and customs which deviate from applicable federal and state standards for jail operations; and,

e. Failure to investigate, report and follow-up on prior incidents involving the use of withholding medical care by jail and medical personnel.

134.    Defendants showed deliberate indifference to Mr. Wright by failing to properly monitor Mr. Wright and/or the areas of the BCJ in which he was being held. Mr. Wright's death could have been prevented if one, some, or all Defendants monitored him more attentively.

135.    The Individual Defendants engaged in this injurious conduct with deliberate indifference to Mr. Wright's health and safety, thereby placing and/or leaving Mr. Wright in substantial risk of serious harm.

136.    At numerous times throughout the course of Mr. Wright's detention, the Individual Defendants knew from Mr. Wright himself, other inmates/detainees on his behalf, and/or the widespread history of medical failures at BCJ that there was a substantial risk that Mr. Wright and detainees and/or inmates like him had serious medical needs that were not being met. Despite such knowledge, the Individual Defendants failed to reasonably respond.

137.    The acts or omissions of the Individual Defendants were conducted within the scope of their official duties and employment.

138.    As a direct and proximate result of the Defendants' conduct, Mr. Wright was injured in various respects, including, without limitation, suffering physical injuries, severe mental anguish, and death, due to the egregious nature of the Individual Defendants actions, all attributable to the deprivation of his constitutional rights guaranteed by the Eight and Fourteenth Amendments of the United States Constitution and protected under 42 U.S.C. §1983.

139.    As a direct and proximate result of the foregoing Defendants' conduct, Mr. Wright died. Mr. Wright's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth and Eighth Amendments of the United States Constitution and protected under 42 U.S.C. §1983.

140.    The foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Wright's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

## COUNT V
## NEGLIGENCE CAUSING WRONGFUL DEATH
*Against Defendant Wellpath and Individual Defendants*

141.    Plaintiff-Decedent, David Cortez Junior Wright, repeats and re-alleges the above paragraphs as if set forth fully herein.

142.    At all times relevant hereto, Defendants were acting within the scope of their employment as employees and/or agents of BERRIEN COUNTY and WELLPATH at BCJ.

143.    At all times relevant hereto, the Michigan Constitution, Michigan statutes, and/or Michigan common law establishes a special relationship between Defendants and Mr. Wright and

requires that Defendants act with ordinary care and provide Mr. Wright with adequate medical care.

144.    Defendants acted grossly negligent and breached their duties in the following ways:

a.    Failing to care for the basic medical needs of Mr. Wright;

b.    Failing to recognize and respond to the clear, life-threatening symptoms that Mr. Wright was exhibiting in his visibly compromised and deteriorating condition;

c.    Failing to provide timely and adequate medical attention despite clear signs of distress and serious medical need;

d.    Failing to send detainees and/or inmates with serious medical needs to the hospital or to a specialist for off-site services/testing;

e.    Failing to communicate amongst fellow medical providers and with BCJ personnel;

f.    Refusing to acknowledge detainees and/or inmates repeated requests for medical attention;

g.    Refusing to open detainees and/or inmates cell doors, preventing them from receiving essential medications when unable to reach the door themselves due to chronic diseases;

h.    Failing to adequately supervise detainees and/or inmates with life-threatening symptoms;

i.    Failing to follow established protocols for monitoring and responding to the medical needs of detainees and/or inmates;

j.    Failing to screen medical personnel/nursing staff to confirm their competency before they are hired;

k.    Failing to adequately monitor, train, discipline and/or control medical personnel/nursing staff after inadequacies in their performance became known or should have become known; and,

l.    Acting with disregard for Mr. Wright's safety, collectively deciding to deny access to critical aid and essential medical care.

145.    As the direct and proximate result of the above-mentioned violations of Mr. Wright's constitutional rights, the ESTATE of Mr. Wright has sustained and is entitled to any and all damages identified and available under the Michigan Wrongful Death Act.

## **PRAYER FOR RELIEF**

146.    WHEREFORE, the Plaintiff-Decedent, Mr. Wright, respectfully requests this Honorable Court enter judgment in his favor and against each of the Defendants, jointly and severally, and award the following:

a.    Any and all damages available under the Michigan Wrongful Death Act, MCLA § 600.2922, including, but not limited to, reasonable medical and hospital expenses; economic costs and/or damages (past, present, and future); loss of love; loss of society and companionship; extreme conscious pain and suffering undergone by Mr. Wright while incarcerated; and all other damages available under the Michigan Wrongful Death Act;

b.    Compensatory non-economic and economic damages;

c.    Non-economic damages;

d.    Punitive damages;

e.       Reasonable interest, costs, and attorney fees; and

f.       Any other such relief this Court deems just under the circumstances.

## **DEMAND FOR JURY TRIAL**

147.   Plaintiff-Decedent, Mr. Wright, by and through his attorneys, FLOOD LAW, PLLC, hereby demands a trial by jury on all issues.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood

**TODD F. FLOOD (P58555)**
155 West Congress Street, Suite 350
Detroit, Michigan 48226
PH: (248) 547-1032
tflood@floodlaw.com
*Attorney for Plaintiff*

Dated: November 20, 2024

**UNITED STATES DISTRICT COURT**
**WESTERN DIVISION OF MICHIGAN**
**SOUTHERN DIVISION**

ELAINE ANDERSON, as Personal Representative
of the ESTATE OF DAVID CORTEZ JUNIOR WRIGHT,
deceased,

                                                        Case No.
                    Plaintiff,                          Honorable

v.

COUNTY OF BERRIEN; SHERIFF LEONARD P. BAILEY;
CAPTAIN CELENA HERBERT; SERGEANT JACOB WILL;          ┌──────────────────────┐
DEPUTY CHRISTINE CIPRIANO; DEPUTY MARK BOELCKE;       │  **PLAINTIFF'S**     │
DEPTUY BRITTANY ZABEL; DEPUTY KENDRA WARMAN;          │ **COMPLAINT AND**    │
DEPUTY NICHOLAS JEWELL; DEPUTY EDWARD KEHOE;          │ **DEMAND FOR A JURY**│
DEPUTY RYAN SCIENSKI; WELLPATH, LLC a Foreign         │    **TRIAL**         │
Limited Liability Company; REX CABALTICA M.D.;        └──────────────────────┘
MARK MORRISEY; KAREN THOMAS; KELLY ANDERSON;
RIANCA WASHINGTON; JOHN DOE, Individually and in his
Official Capacities and JANE DOE, Individually and in her
Official Capacities, Jointly and Severally,

                    Defendants.
_____
TODD F. FLOOD (P58555)
Flood Law, PLLC
155 W. Congress, Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
*Attorney for Plaintiff*
_____


## JURY DEMAND

Plaintiff, ELAINE ANDERSON, Individually and as Personal Representative of the

ESTATE OF DAVID CORTEZ JUNIOR WRIGHT, Deceased, through her attorneys, FLOOD

LAW, PLLC, hereby demands a trial by jury of all of the issues in above-captioned matter.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood

**TODD F. FLOOD (P58555)**
155 West Congress Street, Suite 350
Detroit, Michigan 48226
PH: (248) 547-1032
tflood@floodlaw.com
*Attorney for Plaintiff*

Dated: November 20, 2024